FILED
FEB 2 7 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PCL CONSTRUCTION SERVICES, INC. | ) | |
| Plaintiff, | ) | Case No. 06-144 C |
| v. | ) | Judge ______________ |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## COMPLAINT

PCL Construction Services, Inc., by and through its attorneys, Sherman & Howard, L.L.C., for its Complaint against the United States, states and alleges as follows:

## PARTIES

1. Plaintiff PCL Construction Services, Inc. ("PCL") is a corporation duly organized and existing under the laws of the State of Colorado and has its principal place of business in Denver, Colorado.

2. Defendant United States (the "Government") is a sovereign nation, acting by and through the United States Bureau of Reclamation ("USBR").

3. USBR is a branch of the United States Department of the Interior and an agency or instrumentality of the Government.

4. PCL and the Government, acting by and through USBR, are parties to a firm, fixed price Contract No. 1-CC-30-09150 ("Contract") for the construction of the Visitor Center ("Visitor Center") and Parking Structure ("Parking Structure") at the Hoover Dam.

**JURISDICTION**

5. This Court has jurisdiction over this action pursuant to Section 10(a)(1) of the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 609(a)(1), and the Tucker Act, 28 U.S.C. § 1491(a)(1) and (a)(2).

6. On April 28, 2005, PCL submitted a properly certified claim to the USBR Contracting Officer ("C.O."), pursuant to 41 U.S.C. § 605(c), in the amount of $2,399,483, seeking additional costs as the result of changes in the scope of the Contract ("CRX Claim"). A copy of the CRX Claim certification is attached as Exhibit 1.

7. The C.O. issued a final decision on the CRX Claim on September 30, 2005, denying the claim in its entirety. The C.O. did not address the merits of the CRX Claim but based his denial on the grounds that it previously had been litigated and resolved by this Court and was, therefore, barred by the doctrine of *res judicata*. A copy of the CRX Claim final decision is attached as Exhibit 2.

8. On September 12, 2005, PCL submitted a second certified claim to the C.O., pursuant to 41 U.S.C. § 605(c), in the amount of $19,669,050, requesting a final decision for costs incurred by PCL when it was delayed and disrupted by the Government in performing the Contract ("D&D Claim"). A copy of the D&D Claim certification is attached as Exhibit 3.

9. The C.O. issued a final decision on the D&D Claim on January 13, 2006, in which PCL's D&D Claim was denied in its entirety. The basis of the C.O.'s denial was virtually identical to the C.O.'s denial of the CRX Claim, i.e. the claim had been litigated and resolved by this Court and was barred by *res judicata*. A copy of the D&D Claim final decision is attached as Exhibit 4.

10. On the basis of the C.O.'s denials of both the CRX and D&D Claims, this Court has jurisdiction to consider all matters in this Complaint.

## STATEMENT OF THE CASE
### Procedural History of the Case

11. In September 1991, USBR awarded the Contract to PCL for the construction of the Visitor Center and Parking Structure at the Hoover Dam.

12. The Contract called for PCL to construct a Visitor Center, Parking Structure, and related facilities.

13. While performing the Contract, PCL encountered numerous unanticipated difficulties including, but not limited to, differing site conditions, incomplete and inaccurate drawings and specifications, delays in receiving direction and responses from the USBR to numerous Requests for Information ("RFI"), delays in receiving USBR responses to PCL's submittals, and delays in receiving change orders and other Contract modifications.

14. As a result of the foregoing difficulties and delays, PCL submitted an uncertified request for equitable adjustment ("REA") to the C.O. on April 21, 1994, claiming entitlement to $23,229,471 and a schedule extension of 363 days. PCL was unable to negotiate a resolution of the REA with USBR.

15. Thereafter, PCL submitted a certified claim to the C.O. on July 25, 1995, based on a global breach of contract by USBR ("Breach of Contract Claim"). The Breach of Contract Claim requested $31,040,071. The C.O. issued a final decision on September 21, 1995, denying the Breach of Contract Claim in its entirety.

16. PCL submitted a certified claim to the C.O. on November 22, 1995, which requested release to PCL of previously assessed liquidated damages in the amount of $1,351,838 ("Liquidated Damages Claim"). The C.O. denied PCL's Liquidated Damages Claim on January 23, 1996.

17. Thereafter, PCL appealed the denial of its global Breach of Contract Claim to this Court in a preliminary complaint on October 4, 1995. The Court assigned Case No. 95-666C to PCL's appeal.

18. On July 23, 1996, PCL filed a second complaint based upon the C.O. denial of PCL's Liquidated Damages Claim. The second complaint was assigned Case No. 96-442C by the Court.

19. Judge Marion Horn issued the first of three written decisions on June 24, 1998, in which she granted the Government's summary judgment motion and held that the Contract had not been illegally funded. PCL Construction Services, Inc. v. United States, 41 Fed. Cl. 242 (1998) ("PCL I").

20. After discovery and a lengthy trial, Judge Horn issued a second decision on September 20, 2000, in which she found that the USBR had not breached the Contract with PCL. PCL Construction Services, Inc. v. United States, 47 Fed. Cl. 745 (2000) ("PCL II").

21. Judge Horn issued a third decision on August 28, 2002, in which she determined that PCL was entitled to the release of liquidated damages held by the USBR. PCL Construction Services, Inc. v. United States, 53 Fed. Cl. 478 (2002) ("PCL III").

22. In both of her decisions after the trial, Judge Horn noted their limited scope and expressly identified PCL's reservation of delay and impact claims. See PCL II, 47 Fed. Cl. 745, 759, 761, 763-64, 766-67, 773; PCL III, 53 Fed. Cl. 478, 488.

23. PCL appealed Judge Horn's breach of contract decision in PCL II to the Court of Appeals for the Federal Circuit. On April 7, 2004, the Federal Circuit affirmed Judge Horn's decision, which held the USBR had not breached its contract with PCL. PCL Construction Services, Inc. v. United States, 96 Fed. Appx. 672 (Fed. Cir. 2004).

24. PCL respectfully notes that Judge Horn's decisions contain detailed accounts of the history of the Hoover Dam Visitor Center and Parking Structure and the issues that were actually litigated. Accordingly, this Complaint will not unnecessarily repeat that history except as necessary.

## CONTRACT AWARD

25. On June 14, 1991, USBR advertised Solicitation No.1-SI-30-09050/DC-7853, the Invitation for Bids ("IFB"), for the construction of the Visitor Center and Parking Structure.

26. PCL's bid was made on Standard Form 1442 (rev 4-85), Solicitation No./Specifications No. 1-SI-30-09050/DC-7853 – Visitor Center and Parking Structure, Hoover Dam, Hoover Visitor Facilities, Boulder Canyon Project Nevada.

27. PCL's bid of $33,854,000 was the lowest bid, and on September 5, 1991, USBR awarded the Contract to PCL. The Contract price reflected a firm, fixed-price contract with lump sum pricing for certain schedule items and unit pricing times estimated quantities for other schedule items.

**CONTACT PERFORMANCE**

28. After Contract award, PCL entered into contracts with various subcontractors for work on the Visitor Center and Parking Structure. The major subcontractors include: PCL Civil Constructors, Inc., Harris/Arizona Rebar, Inc., Kearney Electric, Inc., Grinnell Fire Protection Systems Company, Ammon Painting Company, Phoenix Floor & Tile Inc., Quality Mechanical Contractors, Inc., Hoffend & Sons, Inc., Shor-Form, Inc., and J. Wallace Enterprises (the "Subcontractors").

29. USBR issued the Notice to Proceed to PCL on October 21, 1991.

30. The Contract required the Visitor Center to be completed by July 15, 1993, and the Parking Structure to be completed by February 15, 1994.

31. PCL's approved baseline schedule projected that PCL would complete both the Visitor Center and the Parking Structure by July 15, 1993.

32. On April 5, 1993, USBR extended the completion date for the Contract by two days, to July 17, 1993.

33. The Contract, including drawings, specifications, and other Contract-related documents, contained depictions of existing, approximate, and estimated rock depths for the Parking Structure and Visitor Center.

34. The Contract indicated the amount and type of fill that PCL would encounter during performance of the Contract. The Contract also contained a number of other representations concerning site conditions.

35. PCL relied upon the Contract's representations when submitting it bid to USBR.

36. The Contract's representations materially differed from existing physical conditions subsequently found at the Visitor Center and Parking Structure.

37. PCL encountered materially different conditions at numerous locations throughout the Contract work site.

38. After discovering each materially different site condition, PCL notified the C.O. in writing before the existing conditions were disturbed.

39. Prior to Contact award, PCL could not have reasonably foreseen the nature of the existing site conditions, nor could it have discovered the site conditions through a site investigation.

40. PCL and USBR stipulated at the trial before Judge Horn that there were no patent defects or omissions in the Drawings and Specifications at the time of the IFB or Contract Award.

41. USBR's solicitation included drawings and specifications for the construction of the Visitor Center and Parking Structure.

42. PCL based its bid on representations made by USBR in the drawings and specifications.

43. Although there were no patent defects or omissions, there were significant discrepancies in the drawings and specifications.

44. After Contract award, PCL discovered that parts of the drawings and specifications were either incomplete, inaccurate, lacking in detail, or defective.

45. USBR has acknowledged the problems with the drawings and specifications.

46. While performing the Contract, PCL submitted 1,255 RFIs, a large number of which were related to incomplete, inaccurate, lacking in detail, or defective specifications and drawings.

47. USBR acknowledged the unusually high number of RFIs.

48. The incomplete, inaccurate, and defective specifications and drawings required USBR to undertake major redesigns of the Visitor Center and Parking Structure.

49. After Contract award, USBR, acting by and through its designers, was required to redesign the Visitor Center and Parking Structure.

50. During the redesign period, PCL and its Subcontractors could not efficiently perform work or was required to perform planned work out-of-sequence.

51. As a result of USBR's redesign and impact to PCL's planned schedule, PCL and its Subcontractors incurred costs due to delays, disruptions, and related impacts.

52. USBR's redesign effort resulted in unreasonable delays and disruptions to the project, and consequently, PCL and its subcontractors incurred unanticipated costs due to delays, disruptions, and/or impacts. For example, deficiencies in the drawings and specifications made it difficult for PCL and its Subcontractors to submit proper and timely submittals, coordination drawings, concrete placement drawings, concrete lift drawings, and reinforcing steel shop drawings.

53. The Contract required PCL to provide numerous types of submittals to USBR for review and approval within a specified time.

54. PCL reasonably expected USBR to respond promptly to submittals so as not to interfere with PCL's and its Subcontractors' performance.

55. As required by the Contract, PCL provided submittals to USBR for review.

56. USBR unreasonably delayed in its response, failed to provide any response, or in some cases, unreasonably rejected submittals.

57. USBR's unreasonable delays, lack of response, and unreasonable rejections caused PCL and its Subcontractors to incur expenses and costs due to delays, disruptions, and/or impacts since PCL and its Subcontractors depended on timely submittal review and approval.

58. USBR also unreasonably delayed PCL by failing to provide timely direction to PCL through the RFI process.

59. Contract Specification Section I.2.21 provides, in relevant part: "In case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at its own risk and expense." A copy of Contract Specification Section I.2.21 is attached as Exhibit 5.

60. As a result, PCL proposed and USBR agreed and participated in a formal system, by which PCL issued RFIs regarding drawings and specifications in written form, and for which USBR was to respond in writing.

61. As noted above, PCL identified 1,255 items as RFIs.

62. PCL could not have reasonably anticipated the volume of RFIs that were necessary to clarify the drawings and specifications.

63. PCL reasonably expected USBR to respond promptly to RFIs and provide proper direction in a timely manner so as not to interfere with PCL's and its subcontractors' performance.

64. In the RFIs, PCL requested USBR to either respond by a specified date or as soon as possible. A typical example of an RFI is attached as Exhibit 6.

65. Furthermore, in the RFIs, PCL advised USBR that "a delay in the progress of the project could develop if the reply is not received by the required date." See id.

66. Although PCL and USBR agreed in January 1993 to a response time of 10 working days, or 14 calendar days, for RFI responses, USBR continued to unreasonably delay its responses to RFIs.

67. USBR, acting by and through its employees and/or agents, acknowledged that the RFI process was slow, that USBR responses were taking an excessive amounts of time, and that delays in responding to RFIs adversely impacted PCL.

68. USBR's unreasonable delays in providing direction or responding to RFIs caused PCL and its Subcontractors to incur unanticipated costs due to delays, disruptions, and/or impacts.

69. The Contract permits USBR's C.O., either unilaterally or bilaterally, to make changes to the Contract, including changing the drawings and specifications, the method and manner of PCL's performance of work, and the pace of PCL's performance.

70. Contract Specification Section I.1.3 provides, in relevant part: "[T]he Contractor shall, without unnecessary delay, comply with any written or oral order of the Contracting Officer or his or her authorized representative." A copy of Contract Specification Section I.1.3 is attached as Exhibit 7.

71. While administering the Contract, the C.O. issued more than 140 changes, which affected the drawings and specifications, the method and manner of PCL's performance, and the speed at which PCL could perform the Contract.

72. If additional work was required pursuant to USBR's actual or constructive changes, PCL assigned a Change Request Extra ("CRX") for the extra work.

73. PCL's CRXs included the date, circumstance, and source of the change, as well as a statement that PCL regarded the additional work as a change and were submitted to USBR.

74. PCL's CRXs to USBR were prompt, sufficient, and in writing.

75. PCL issued 537 CRXs to USBR while performing the Contract.

76. USBR found 335 of PCL's CRXs to have merit, and in some, but not all instances, USBR made payments to PCL.

77. By April 2005, 113 CRXs remained unresolved.

78. PCL's certified CRX Claim identifies 4 categories of unresolved CRXs:

a. Unilateral Modifications with provision to obtain at least partial payment;

b. Unilateral Modifications with no provision to obtain payment;

c. CRXs initiated by PCL for which USBR finds merit; and

d. CRXs initiated by PCL that USBR questions.

79. USBR unreasonably delayed issuing changes following PCL's submission of RFIs or CRXs, and the unreasonable delays resulted, in part, from USBR's failure to reasonably administer the change process.

80. USBR's unreasonable delays in issuing changes caused PCL and its Subcontractors to incur unanticipated costs and expenses.

**PRESERVATION OF CLAIMS**

81. Contract modifications executed between PCL and USBR included reservation of rights clauses that reserved PCL's right to submit time and cost impacts claims.

82. While the terms of the reservation of rights clauses evolved over time, the effect of the reservation clauses was to preserve PCL's rights to submit delay claims.

83. The following is an example of a typical reservation of rights clause:

> The Contractor agrees that this supplemental agreement is a complete equitable adjustment for all Contractor proposals or claims whatsoever arising out of, resulting from, and/or directly related to the above occurrences, revisions to the contract, and/or this supplemental agreement and hereby releases the Government from all liability under this contract for further equitable adjustments for said occurrences, revisions, and/or this supplemental agreement, except for time and costs impacts for extended overhead, for impacts on unchanged work, and for any contribution toward the cumulative impact of all changes on the critical path of the project schedule.

An example of a typical reservation clause is attached as Exhibit 8.

84. PCL included reservation of rights clauses in many Contract modifications, including, but not limited to: 4, 7, 9, 10, 13, 14, 15, 22, 24, 26, 28, 29, 30, 31, 32, 33, 35, 36, 37, 39, 40, 41, 42, 43, 45, 46, 47, 48, 54, 63, 64, 66, 67, 69, 70, 71, 73, 74, 75, 76, 77, 78, 82, 84, 85, 87, 88, 89, 90, 91, 93, 94, 95, 96, 97, 99, 100, 101, 102, 105, 106, 107, 109, 110, 111, 114, 115, 116, 120, 121, 126, 127, 128, 131, 132, 133, 136, 137, 138, 139, 140, 142, and 143.

85. In addition to the foregoing reservation clauses, PCL included reservation language in letters sent to the USBR concerning the Modifications. The following is a typical example:

> [This CRX is] based solely on the usual cost elements; such as, labor, material, and normal markups, and does not include any amount for changes in sequence of work, delays, disruptions, rescheduling, extended overhead, acceleration, and/or impact costs. The right is expressly reserved to make claim for any and all of these, and related items of cost, prior to any final settlement of this contract.

An example of a typical letter is attached as Exhibit 9.

**REQUEST FOR EQUITABLE ADJUSTMENT**

86. In late 1993, Warren Shouldis, the initial USBR C.O., asked PCL to prepare and submit a REA.

87. On April 21, 1994, PCL submitted the requested REA, claiming entitlement to $23,229,471 and to a schedule extension of 363 days.

88. The uncertified REA based entitlement on delays and disruptions arising from defective Contract drawings and specifications, different site conditions, time required for resolution of RFIs, and time impacts due to Contract changes.

89. On February 24, 1995, a new USBR C.O., Carolyn Tempel, notified PCL that USBR had evaluated the REA and, although the C.O. found no entitlement, the C.O. requested that PCL participate in a fact-finding session regarding preparation of an as-built schedule in order to agree upon responsibility for critical delays to the project.

90. PCL justifiably interpreted the C.O.'s finding of no entitlement as a denial of its REA. Thereafter, on July 25, 1995, PCL submitted its certified global Breach of Contract Claim to the C.O.

## LIQUIDATED DAMAGES

91. In a letter dated March 14, 1995, the C.O. stated that an assessment of liquidated damages would be made against PCL when "responsibilities for time associated with delays are made" and that liquidated damages would be assessed against PCL for those delays not found to the be the responsibility of the Government.

92. On March 26, 1996, the C.O. notified PCL that liquidated damages in the amount of $1,285,000 were due to USBR since PCL had not "provided support demonstrating entitlement to delay."

93. The C.O.'s March 26 1996 assessment did not identify itself as a final decision, nor did the it inform PCL of its rights to appeal pursuant to the CDA.

## SUBSTANTIAL COMPLETION, RETAINAGE, AND TERMINATION

94. On June 9, 1995, the C.O. issued to PCL a Certificate of Substantial Completion, certifying that the Contract was substantially complete as of May 11, 1995.

95. USBR began using the Visitor Center and Parking Structure on May 12, 1995.

96. On June 21, 1995, USBR opened the Visitor Center and Parking Structure to tourists.

97. As of July 25, 1995, USBR was retaining money from PCL pursuant to the USBR's interpretation of Contract Specification 1.5.1.

98. USBR denied PCL's request for the release of retainage on August 22, 1995, stating that continued retainage served to protect the Government.

99. On November 22, 1995, PCL notified USBR that it had performed the Contract and was entitled to retained money.

100. Furthermore, citing to the Government's demands for what PCL believed was work outside the scope of the Contract and USBR's continued withholding of funds, PCL notified USBR on November 22, 1995 that it would perform no additional work on the Contract.

101. On March 6, 1996, the C.O. terminated the Contract for default and asserted that PCL breached the Contract.

**GLOBAL BREACH OF CONTRACT AND LIQUIDATED DAMAGES CLAIMS**

102. As discussed above, PCL submitted a properly certified global Breach of Contract Claim to the C.O. in the amount of $31,040,071 on July 25, 1995.

103. The C.O. denied PCL's Breach of Contract Claim on September 21, 1995.

104. On November 22, 1995, PCL submitted a properly certified Liquidated Damages Claim in the amount of $1,351,838. That claim was denied by the C.O. on January 23, 1996.

105. Thereafter, PCL filed two complaints in this Court, as discussed above.

106. PCL filed a preliminary complaint on October 4, 1995, based upon the CO's final decision denying PCL's Breach of Contract Claim.

107. Following discovery, PCL's filed an amended complaint on April 1, 1996.

108. On July 23, 1996, PCL filed a second complaint, based upon the C.O.'s final decision denying PCL's Liquidated Damages Claim.

109. After a lengthy trial but before written decisions were issued, Judge Horn encouraged the parties to attempt to settle PCL's claims. Thereafter, PCL and USBR attempted to negotiate a settlement.

110. Pursuant to Judge Horn's encouragement, in late May 1999, PCL submitted a Schedule and Cost Analysis to USBR, analyzing the costs incurred by PCL and its Subcontractors due to delays, disruptions, and impacts attributable to USBR.

111. In a letter dated May 27, 1999, the Government's attorney, Mr. Brian S. Smith, Commercial Litigation Branch, United States Department of Justice, responded that it was not in the best interests of the Government to litigate a global breach of contract claim while also discussing the issues identified in the Schedule and Costs Analysis. A copy of the May 27, 1999 letter is attached as Exhibit 10.

112. Mr. Smith's letter contained the following statement:

> [W]e will not engage in discussions with PCL unless and until PCL dismisses its breach of contract case with prejudice and submits a certified equitable adjustment claim for delay/impacts, or the Court enters judgment in favor of the Government on all counts of PCL's breach of contract case and PCL submits a certified equitable adjustment claim for delay/impacts.

See id.

113. During the closing arguments on July 2, 1999, Mr. Smith acknowledged PCL's express claim reservations for delays, disruptions, and/or impacts based upon USBR's conduct during the performance of the Contract. A copy of the relevant sections of the Closing Arguments is attached as Exhibit 11.

114. Smith again noted the significance of the reservation clauses:

> The impact of this release language is that they are releasing everything but an equitable adjustment for the time and cost impacts or extended overhead for impacts on unchanged work and for any contribution towards cumulative impact of all changes on the critical path of project schedule.

See id., Tr. 12978:14-20.

115. Smith expressed the Government's view of PCL's reservation of rights to bring subsequent claims, "[PCL] did not release the right to present an equitable adjustment delay claim." See id., Tr. 12979:2-3.

116. During a discussion with Judge Horn during his closing argument, Smith stated that if Judge Horn found no global breach and "[t]hen PCL will be free to go off and make an equitable adjustment claim if it wants to. The contracting officer will get an opportunity to pass on it, as it has never been provided. And if the parties do not resolve them at that level, it will proceed just like a normal case." See id., Tr. 12995:6-12. Smith then reassured Judge Horn that "[w]e, the Bureau, are ready, and the contracting officer has always been and continues to be ready to adjudicate an equitable adjustment claim." See id., Tr. 13002:25 – 13003:2.

117. PCL and the USBR were unable to negotiate a mutually acceptable settlement of PCL's claims, and subsequently, Judge Horn issued decisions in PCL II and III discussed above.

118. As a result of Judge Horn's denial of PCL's global Breach of Contract Claim, PCL has availed itself of its reservation of its delay claims and unresolved CRX claims.

## FIRST CLAIM FOR RELIEF
## (Differing Site Conditions - Type I)

119. PCL repeats the allegations of paragraphs 1 through 118 inclusive, as set forth fully herein.

120. PCL is entitled to an equitable adjustment of the Contract based upon differing site conditions.

121. The Contract's Differing Site Conditions clause is I.4.10 and states, in relevant part:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract . . . .
>
> (b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract and the contract modified in writing accordingly.
>
> (c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required . . . .

A copy of Contract Clause I.4.10 is attached as Exhibit 12.

122. USBR's pre-award representations to PCL differed materially from those actually encountered during performance of the Contract.

123. PCL complied with all procedural requirements necessary for entitlement to an equitable adjustment.

124. The actual site conditions were unforeseeable based upon all information available to PCL at the time of the IFB and Contract Award.

125. PCL reasonably relied upon its interpretation of the Contract and Contract-related documents.

126. PCL and its Subcontractors incurred expenses and costs, in an amount to be proven at trial, as a result of the material differences in the pre-award documents and those actually encountered.

127. USBR directly caused delays by its actions or inactions, including, but not limited to, material delays in responding to the differing site conditions.

128. PCL expressly reserved the right to bring any claims for delays, disruptions, and impacts to it performance of the Contract.

129. USBR's delays were of an unreasonable length.

130. These unreasonable delays extended the Contract completion time, and injured PCL and its Subcontractors in the form of additional, unanticipated cost.

131. There are no delays concurrent with the delays that are the fault of USBR.

132. USBR's delay in responding to the differing site conditions disrupted PCL's and its Subcontractors' ability to perform according to the Contract, progress, sequence of work, efficiency, and ability to perform the work in a timely and efficient manner.

133. These disruptions were unreasonable, extended the Contract completion time, and injured PCL and its Subcontractors in the form of additional expense and loss.

134. There were no disruptions concurrent with the disruptions that are the fault of USBR.

135. PCL has satisfied all conditions precedent to its entitlement to an equitable adjustment of the Contact for Category I Differing Site Conditions.

**SECOND CLAIM FOR RELIEF**
**(Differing Site Conditions - Type II)**

136. PCL repeats the allegations of paragraphs 1 through 135, inclusive, as set forth fully herein.

137. PCL is entitled to an equitable adjustment of the Contract based upon differing site conditions.

138. The Contract's Differing Site Conditions clause is I.4.10 and states, in relevant part:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of . . . (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
>
> (b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract and the contract modified in writing accordingly.
>
> (c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be

> allowed, unless the Contractor has given the written notice required . . ..

See Exhibit 12.

139. At the time of the IFB and Contact Award, PCL was unaware of the actual site conditions.

140. PCL complied with all procedural requirements necessary for entitlement to an equitable adjustment.

141. The actual site conditions were of an unusual nature.

142. The actual site conditions differed materially from comparable work.

143. As a result of the actual site conditions, PCL and its Subcontractors incurred expenses and costs, in an amount to be proven at trial, due to delays, disruptions, and/or impacts.

144. PCL expressly reserved the right to bring any claims for delays, disruptions, and impacts to it performance of the Contract.

145. USBR directly caused delays by its actions or inactions, including, but not limited to, delays in responding to PCL's notice of differing site conditions.

146. USBR's delays were of an unreasonable length.

147. These unreasonable delays extended the Contract completion time, and injured PCL and its Subcontractors in the form of additional, unanticipated costs.

148. There are no delays concurrent with the delays that are the fault of the USBR.

149. The actual conditions and USBR's delay in responding to the differing site conditions disrupted PCL's and its Subcontractors' ability to perform according to the Contract,

progress, sequence of work, efficiency, and ability to perform the work in the most time and cost efficient manner.

150. PCL has satisfied all conditions precedent to its entitlement to an equitable adjustment of the Contact for Category II Differing Site Conditions.

**THIRD CLAIM FOR RELIEF**
**(Changes)**

151. PCL repeats the allegations of paragraphs 1 through 150, inclusive, as set forth fully herein.

152. PCL is entitled to an equitable adjustment of the Contract for changes to the Contract.

153. The Contract's Changes Clause is I.4.12 and states, in relevant part:

> (a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes –
>
> (1) In the specifications (including drawings and designs);
> (2) In the method or manner of performance of the work;
> (3) In the Government-furnished facilities, equipment, materials, services, or site; or
> (4) Directing acceleration in the performance of the work.
>
> . . .
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's costs of, or the time required for, the performance of any part of the work under this contract, whether or not changed by a change order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing . . . In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

A copy of Contract Clause I.4.12 is attached as Exhibit 13.

154. USBR, acting by and through the C.O., changed the Contract, pursuant to Clause I.4.12.

155. The written changes were within the general scope of the Contract and were made by the C.O.

156. The C.O.'s changes materially increased PCL's and its Subcontractors' performance requirements, including the time required to perform the original Contract work and changed work, and increased PCL's and its Subcontractors' costs associated with delayed work.

157. The C.O.'s changes disrupted PCL's and its Subcontractors' work by requiring out of sequence work, which resulted in unproductive and inefficient work.

158. PCL and its Subcontractors performed the changed work.

159. PCL's and its Subcontractors' increased costs were the direct and necessary result of the changes.

160. PCL has satisfied all conditions precedent to its entitlement to an equitable adjustment of the Contact for Changes.

**FOURTH CLAIM FOR RELIEF**
**(Suspensions of Work)**

161. PCL repeats the allegations of paragraphs 1 through 160, inclusive, as set forth fully herein.

162. PCL is entitled to an equitable adjustment of the Contract under the Suspension of Work Clause.

163. The Contract's Suspension of Work Clause is I.4.3 and states, in relevant part:

> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1)

> by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

A copy of Contract Clause I.4.3 is attached as Exhibit 14.

164. During the performance of the Contract, there were many suspensions and delays to PCL's and its Subcontractors' performance of the work.

165. PCL expressly reserved the right to bring any claims for delays, disruptions, and impacts to it performance of the Contract.

166. USBR directly caused suspensions and delays to PCL's and it Subcontractors' work by its actions or inactions, including, but not limited to:

a. Delays due to failure to furnish adequate Drawings and Specifications and to timely correct their deficiencies;

b. Delays in providing direction;

c. Delays in responding to requests for clarification or information;

d. Delays in responding to differing site conditions;

e. Delays in approving Submittals;

f. Delays due to unreasonable rejection of Submittals; and

g. Delays in timely preparing and issuing Change Orders and/or Modifications.

167. USBR's suspensions and delays were unreasonably long.

168. These unreasonable suspensions and delays extended the Contract completion time, and injured PCL and its Subcontractors in the form of additional, unanticipated costs.

169. The foregoing delays and suspensions of work are not concurrent with any other delays.

170. PCL has satisfied all conditions precedent to its entitlement to an equitable adjustment of the Contact for suspensions of work.

**FIFTH CLAIM FOR RELIEF**
**(Constructive Changes)**

171. PCL repeats the allegations of paragraphs 1 through 170, inclusive, as set forth fully herein.

172. The Contract provided that if PCL's performance was changed through no fault of PCL and PCL's costs or time of performance were increased as a result, then USBR, acting through its C.O., was required to equitably adjust the Contract under one or more of the Contract's remedy-granting clauses, e.g., Changes, Differing Site Conditions, Suspension of Work.

173. PCL's and its Subcontractors' performance of the Contract work was delayed and disrupted by actions or omissions of USBR and through no fault of PCL, and consequently, PCL's and its Subcontractors' costs and time of performance was increased.

174. USBR, acting through its C.O., improperly refused and failed to equitably adjust the Contract by denying PCL's CRX and D&D Claims.

175. As a direct and proximate result of USBR's failure to equitably adjust the Contract, PCL has incurred damages in an amount to be proven at trial.

176. PCL has, for its part, performed all terms and conditions of the Contract as conditions precedent to recovery of its damages.

WHEREFORE, Plaintiff requests this Court:

A. Determine that the appropriate equitable adjustment Defendant properly should have made to the Contract under the Contract's Differing Site Conditions, Changes, and Suspension of Work Clauses and enter judgment in favor of Plaintiff and against Defendant in the amount of the equitable adjustment so found;

B. Order Defendant to pay Plaintiff's costs, plus any additional amounts proven at trial (with interest thereon from the date of expenditure);

C. Award Plaintiff its costs incurred in litigating these claims, including expert witness fees and costs of investigation, reasonable attorneys' fees, and pre-judgment, moratory, and post-judgment interest at the maximum lawful rate;

D. Award such other and further relief which this Court deems just and equitable.

DATED this 23rd day of February, 2006.

SHERMAN & HOWARD LLC

By: ______________________
Durward E. Timmons
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903
Phone: 719-475-2440
Fax: 719-635-4576

Attorneys for Plaintiff

PCL

CONSTRUCTION LEADERS

CHAMPION of HOPE

April 28, 2005

Mr. Ken Miller
Contracting Officer
U. S. Bureau of Reclamation
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470

**Subject:** **Hoover Dam Visitor Center Contract**
**Request for Contracting Officer's Final Decision on CRXs**

**Re:** (a) **Contract No. 1-CC-30-09150; Visitor Center and Parking Structure, Hoover Visitor Facilities, Boulder Canyon Project, Boulder City, Nevada**

(b) **PCL Letter dated December 16, 2004**

(c) **Department of Justice Letter dated January 12, 2005**

Mr. Miller:

Mr. Peter Beaupré of PCL wrote to you on December 16, 2004, and indicated that he was the President of PCL Construction Enterprises, Inc., the parent company of PCL Construction Services, Inc and was responsible for PCL's United States operations. You did not respond to that letter. Rather, Mr. Brian Smith, a Department of Justice attorney who represented the U. S. Bureau of Reclamation ("USBR") in prior litigation between PCL and your agency, sent a letter dated January 12, 2005, to Herbert Fenster and Durward Timmons, two of PCL's outside counsel, in which Mr. Smith referenced PCL's December 16, 2004, letter to you. You were copied on Mr. Smith's letter. Mr. Smith's letter stated, in unequivocal terms,

> ".....The Government certainly is not going to negotiate with PCL for payment of claims that were already addressed and resolved by both the trial and appeals courts.
>
> In sum, PCL's "unresolved" CRXs were, in fact, resolved in the Court of Federal Claims case and the appeal thereof. For this reason, there is nothing further to discuss."

PCL disagrees with Mr. Smith's conclusion that all issues associated with Contract No. 1-CC-30-09150 are resolved and therefore "there is nothing further to discuss." By this letter I am transmitting to you PCL's claim for additional compensation in the amount of $2,399,483 for

April 28, 2005
Page 2 of 2

CRXs which remain outstanding and unresolved. The CRXs were neither resolved by the USBR nor were they resolved in previous litigation between PCL and the USBR. Accordingly, PCL requests a contracting officer's final decision concerning the CRXs.

As required by the Contract Disputes Act, 41 U.S.C. §605(c)(1), I certify that the foregoing claim is made in good faith, that the supporting data is accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which PCL believes the USBR is liable, and that I am duly authorized to certify this claim on behalf of PCL.

Yours truly,

PCL CONSTRUCTION SERVICES, INC.

Al Troppmann
President

Attachment a/s

# United States Department of the Interior

BUREAU OF RECLAMATION
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:

LC-3130
PRJ-8.10

SEP 30 2005

CERTIFIED - RETURN RECEIPT REQUESTED (7002 0860 0000 1981 3814)

PCL Construction Services, Inc.
Attention: Mr. Al Troppmann, President
2000 South Colorado Boulevard, Tower Two, Suite 2-500
Denver CO 80222

Subject: Modification No. 148 – Contracting Officer's Final Decision on CRX Claim - Specifications No. DC-7853/Contract No. 1-CC-30-09150 – Visitor Center and Parking Structure, Hoover Visitor Facilities – Boulder Canyon Project, Nevada (Your Certified Claim Dated April 28, 2005; Received May 2, 2005; and My Letter to You Dated June 29, 2005)

Dear Mr. Troppmann:

Enclosed is Modification No. 148 to the subject contract. Modification No. 148 constitutes my final decision in the matter of your certified claim dated April 28, 2005.

Sincerely,

Kenneth A. Miller

Kenneth A. Miller
Contracting Officer

Enclosure (Modification No. 148)

Exhibit 2

## AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | Page of Pages |
|---|---|
| | 1 \| 6 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 148 | See Block 16C | | |

| 6. ISSUED BY CODE LC-3100 | 7. ADMINISTERED BY (If other than Item 6) CODE LC-6000 |
|---|---|
| Bureau of Reclamation<br>Lower Colorado Region<br>P.O. Box 61470<br>Boulder City, NV 89006-1470 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State, and ZIP code) | (✓) | |
|---|---|---|
| PCL Construction Services, Inc.<br>Mr. Al Troppmann, President<br>2000 South Colorado Boulevard, Tower Two, Suite 2-500<br>Denver, CO 80222 | | 9A. AMENDMENT OF SOLICITATION NO. |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>1-CC-30-09160 |
| CODE \| FACILITY CODE | | 10B. DATED (SEE ITEM 13)<br>September 5, 1991 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[ ] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended.
Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning __ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change and offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT/ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| √ | D. OTHER (Specify type of modification and authority)<br>Contracting Officer's Final Decision; Contract Clause I.1.7, 52.233-1 Disputes (April 1984) Alternate I (April 1984) |

E. IMPORTANT: Contractor [ X ] is not, [ ] is required to sign and return __ original copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible)
Certified Mail – Return Receipt No. 7002 0860 0000 1981 3814

Project Title: Visitor Center and Parking Structure, Hoover Visitor Facilities – Boulder Canyon Project Construction, Nevada.

Purpose of Modification: This Modification constitutes the Contracting Officer's Final Decision in the matter of the Contractor's claim dated April 26, 2005; received by the Contracting Officer on May 2, 2005.

(See Following Pages)

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>Kenneth A. Miller, Contracting Officer | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br><br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY Kenneth A. Miller<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>9/30/05 |

NSN 7540-01-152-8070 30-105
PREVIOUS EDITION UNUSABLE
FAR (48 CFR) 53.243

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA

A. **Contract Background.**

Contract No. 1-CC-30-09150 (entitled "Visitor Center and Parking Structure, Hoover Visitor Facilities – Boulder Canyon Project, Nevada") ("the contract") was awarded to PCL Construction Services, Inc. ("PCL" or "the Contractor"), on September 5, 1991, in the amount of $33,854,000, by the Lower Colorado Regional Office of the United States Bureau of Reclamation ("the Government").

Section H.1 of the firm fixed-price contract required that PCL complete the Visitor Center by July 15, 1993; and the Parking Structure by February 15, 1994.

PCL received the Notice to Proceed on October 22, 1991, and commenced mobilization and preparatory work in November of 1991. PCL substantially completed the work on May 11, 1995.

In July of 1995, PCL filed a certified total cost, total breach claim in an amount exceeding $31 million, alleging that the Government had breached the contract and that the contract was executed illegally ("the total breach claim"). In September of 1995, the Contracting Officer denied the total breach claim in its entirety.

In October of 1995, PCL appealed the Contracting Officer's final decision on the total breach claim to the United States Court of Federal Claims ("the COFC").

PCL repudiated the contract and abandoned the job in November of 1995; and the contract was terminated for default accordingly by the Contracting Officer in March of 1996.

In September of 2000, the COFC found in favor of the Government and awarded PCL no money in the litigation of the total breach claim.. The COFC further upheld the Government's 1996 default termination of PCL. In June of 2003, PCL appealed the COFC decision (except for the default termination) to the United States Court of Appeals for the Federal Circuit ("the CAFC"). The CAFC affirmed the COFC decision in April of 2004.

B. **Description of the Claim or Dispute.** [FAR 33.211 (a) (4) (i)]

By letter dated April 28, 2005, PCL submitted a certified claim "for additional compensation in the amount of $2,399,483 for CRXs which remain outstanding and unresolved ("the claim")". The claim was received by the Contracting Officer on May 2, 2005. The claim did not request that the Contracting Officer render a decision within 60 days. By letter dated June 29, 2005, the Contracting Officer notified PCL that he would render a final decision on PCL's claim on or before September 30, 2005.

PCL describes its claim thus: "Typically, if a contract modification, supplemental drawings, or RFI [Request for Information] required additional work, PCL would assign a Change Request Extra ("CRX") to the task." "At this time, 113 CRXs, valued at $2,399,483, remain unresolved." Claim at 6.

PCL further states its claim as follows: "PCL believes that none of the three decisions issued by the COFC specifically decided the CRX claims which are the subject matter of this claim. To the extent that specific CRX issues were addressed and decided by the COFC, PCL has made every attempt to exclude them from this claim submission. As a result PCL seeks only compensation for CRX claims which it believes are outstanding and unresolved." Claim at 6.

C. **Pertinent Contract Clauses, Terms, and Conditions**. [FAR 33.211 (a) (4) (ii)]

**Contract Section I.1.7, 52.233-1 Disputes (April 1984) Alternate I (April 1984)**

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613) (the Act).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $50,000 is not a claim under the Act until certified as required by subparagraph (d) (2) below. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(d) (1) A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer.

(2) For Contractor claims exceeding $50,000, the Contractor shall submit with the claim a certification that:

(i) The claim is made in good faith;

(ii) Supporting data are accurate and complete to the best of the Contractor's knowledge and belief; and

(iii) The amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

(3) (i) If the Contractor is an individual, the certification shall be executed by that individual.

(ii) If the Contractor is not an individual, the certification shall be executed by –

(A) A senior company official in charge at the Contractor's plant or location involved; or

(B) An officer or general partner of the Contractor having overall responsibility for the conduct of the Contractor's affairs.

(e) For Contractor claims of $50,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor-certified claims over $50,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

(f) The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

(g) The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Officer receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

(h) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer.

D. <u>Factual Areas of Agreement and Disagreement</u>. [FAR 33.211 (a) (4) (iii)]

The Government disagrees that "none of the three decisions issued by the COFC specifically decided the CRX claims which are the subject matter of this claim". The Government further disagrees that PCL's "CRX claims... are outstanding and unresolved". For these reasons, the Government disagrees with the claim in its entirety.

E. <u>Contracting Officer's Supporting Rationale</u>. [FAR 33.211 (a) (4) (iii)]

PCL seeks for itself and several of its subcontractors "compensation" in the collective amount of $2,399,483 plus interest "for CRX claims which it believes are outstanding and unresolved". PCL claims that the COFC did not "specifically" decide the 113 CRXs which are the subject matter of this claim.

PCL's 1995 total breach claim was a total cost claim which clearly included all costs incurred by PCL in its partial performance of the contract, including the CRXs at issue in the instant claim. In its total breach claim, PCL did not segregate "outstanding and unresolved" CRXs from its claim and those costs were therefore before the COFC. At trial of PCL's total breach claim, PCL elected to pursue a total-breach-of-contract theory of entitlement, and further elected to exclude virtually all other methods, including some "unresolved" CRXs, by which to prove entitlement to the money that PCL sought. However, the changed work performed by PCL was a fundamental part of PCL's total breach claim, which was based largely upon the number of CRXs submitted to the Government during PCL's partial performance of the work. PCL introduced at trial some evidence concerning "unresolved" CRXs, and the COFC specifically addressed "unresolved" CRXs, finding that no money was due to PCL. See, 47 Fed. Cl. 777, 806.

The Contracting Officer finds that PCL's "CRX claims which it believes are outstanding and unresolved" have in fact been litigated and resolved; that a decision in favor of the Government has been made by the COFC; that the entire decision of the COFC was affirmed by the CAFC; and that the instant claim is barred by the doctrine of res judicata. The doctrine of res judicata applies not only to the specific claims that were asserted or emphasized by PCL at the trial of its total breach claim, but also to the claims that could have been made because they arise out of the same transactional facts. See, e.g., Florida Power and Light Co. v. United States, 198 F.3d 1358 (Fed. Cir. 1999). The "unresolved" CRXs were a fundamental part of PCL's total breach claim; and PCL's decision not to identify the "unresolved" CRXs as a separate item in the total breach claim was its own, and does not serve to remove those CRXs from the total breach claim litigation or from the effect of res judicata.

F. **Contracting Officer's Final Decision**. [FAR 33.211 (a) (4) (iv)]

In accordance with Section E. above, the Contracting Officer finds that PCL's claims have been previously litigated and resolved by the COFC, which found that PCL is due no money. Accordingly, PCL's instant claim for "unresolved" CRXs is barred by the doctrine of res judicata. It is therefore the final decision of the Contracting Officer that the Contractor's claim is without merit in its entirety and is therefore denied.

Adjustment in the Contract Time: There is no adjustment in the time required for performance of the contract by reason of this Modification.

Adjustment in the Contract Price: There is no adjustment in the total contract price by reason of this Modification.

Notice of No Change in Funds Reserved: There is no change to the funds previously reserved under the contract.

G. **Notice of Appeal Procedures**. [FAR 33.211 (a) (4) (v)]

This is the final decision of the Contracting Officer. You may appeal this decision to the agency

board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C.603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

PCL

CONSTRUCTION LEADERS

CHAMPION of HOPE

September 12, 2005

Mr. Ken Miller
Contracting Officer
U. S. Bureau of Reclamation
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470

Re: **(a) Contract No. 1-CC-30-09150; Visitor Center and Parking Structure, Hoover Visitor Facilities, Boulder Canyon Project, Boulder City, Nevada**
**(b) PCL Letter dated April 28, 2005**

**Subject: Hoover Dam Visitor Center Contract; Request for Contracting Officer's Final Decision; Delay and Disruption Claim**

Mr. Miller:

By this letter I am transmitting to you PCL Construction Services, Inc.'s ("PCL") claim for $19,669,050 as a result of delays and disruptions PCL incurred in performing the referenced contract. In view of the U. S. Bureau of Reclamation's ("USBR") position concerning PCL's right to submit and have you consider claims under the Contract, as outlined in my letter to you of April 28, 2005, PCL requests a contracting officer's final decision concerning this claim.

As required by the Contract Disputes Act, 41 U.S.C. §605(c)(1), I certify that the foregoing claim is made in good faith, that the supporting data is accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which PCL believes the USBR is liable, and that I am duly authorized to certify this claim on behalf of PCL.

Yours truly,

PCL CONSTRUCTION SERVICES, INC.

A. E. Troppmann
President

Attachment

# United States Department of the Interior

BUREAU OF RECLAMATION
Lower Colorado Regional Office
P.O. Box 61470
Boulder City, NV 89006-1470

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:

LC-3130
PRJ-8.10

JAN 13 2006

CERTIFIED - RETURN RECEIPT REQUESTED (7004 1160 0002 9516 7535)

PCL Construction Services, Inc.
Attention: Mr. Al Troppmann, President
2000 South Colorado Boulevard, Tower Two, Suite 2-500
Denver CO 80222

Subject: Modification No. 149 – Contracting Officer's Final Decision on Delay and Disruption Claim - Specifications No. DC-7853/Contract No. 1-CC-30-09150 – Visitor Center and Parking Structure, Hoover Visitor Facilities – Boulder Canyon Project, Nevada (Your Certified Claim Dated September 12, 2005; Received September 13, 2005; and My Letter to You Dated November 11, 2005)

Dear Mr. Troppmann:

Enclosed is Modification No. 149 to the subject contract. Modification No. 149 constitutes my final decision in the matter of your certified claim dated September 12, 2005.

Sincerely,

Kenneth A. Miller

Kenneth A. Miller
Contracting Officer

Enclosure (Modification No. 149)

Exhibit 4

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | Page of Pages 1 \| 6 |
|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. 149 | 3. EFFECTIVE DATE See Block 16C | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 6. ISSUED BY CODE LC-3100<br>Bureau of Reclamation<br>Lower Colorado Region<br>P.O. Box 61470<br>Boulder City, NV 89006-1470 | | 7. ADMINISTERED BY (If other than Item 6) CODE LC-6000 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State, and ZIP code) | (✓) | |
|---|---|---|
| PCL Construction Services, Inc.<br>Mr. Al Troppmann, President<br>2000 South Colorado Boulevard, Tower Two, Suite 2-500<br>Denver, CO 80222 | | 9A. AMENDMENT OF SOLICITATION NO. |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO. 1-CC-30-09150 |
| CODE \| FACILITY CODE | | 10B. DATED (SEE ITEM 13) September 5, 1991 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[ ] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended. Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning __ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change and offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT/ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| √ | D. OTHER (Specify type of modification and authority)<br>Contracting Officer's Final Decision; Contract Clause I.1.7, 52.233-1 Disputes (April 1984) Alternate I (April 1984) |

E. IMPORTANT: Contractor [ X ] is not, [ ] is required to sign and return __ original copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible)
Certified Mail – Return Receipt No. 7004 1160 0002 8516 7535

Project Title: Visitor Center and Parking Structure, Hoover Visitor Facilities – Boulder Canyon Project Construction, Nevada.

Purpose of Modification: This Modification constitutes the Contracting Officer's Final Decision in the matter of the Contractor's claim dated September 12, 2005; received by the Contracting Officer on September 13, 2005.

(See Following Pages)

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>**Kenneth A. Miller, Contracting Officer** | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY Kenneth A. Miller<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>1/13/06 |

NSN 7540-01-152-8070 30-105
PREVIOUS EDITION UNUSABLE
FAR (48 CFR) 53.243

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA

00012

A. **Contract Background.**

Contract No. 1-CC-30-09150 (entitled "Visitor Center and Parking Structure, Hoover Visitor Facilities – Boulder Canyon Project, Nevada") ("the contract") was awarded to PCL Construction Services, Inc. ("PCL" or "the Contractor"), on September 5, 1991, in the amount of $33,854,000, by the Lower Colorado Regional Office of the United States Bureau of Reclamation ("the Government").

Section H.1 of the firm fixed-price contract required that PCL complete the Visitor Center by July 15, 1993, and the Parking Structure by February 15, 1994.

PCL received the Notice to Proceed on October 22, 1991, and commenced mobilization and preparatory work in November of 1991. PCL substantially completed the work on May 11, 1995.

In July of 1995, PCL filed a certified total cost, total breach claim ("total breach claim") in an amount exceeding $31 million, alleging that the Government had breached the contract and that the contract was executed illegally. In September of 1995, the Contracting Officer denied the total breach claim in its entirety.

In October of 1995, PCL appealed the Contracting Officer's final decision on the total breach claim to the United States Court of Federal Claims ("the COFC").

PCL repudiated the contract and abandoned the job in November of 1995, and the contract was terminated for default accordingly by the Contracting Officer in March of 1996.

In September of 2000, the COFC found in favor of the Government and awarded PCL no money in the litigation of the total breach claim. The COFC further upheld the Government's 1996 default termination of PCL. In June of 2003, PCL appealed the COFC decision (except for the default termination) to the United States Court of Appeals for the Federal Circuit ("the CAFC"). The CAFC affirmed the COFC decision in April of 2004.

B. **Description of the Claim or Dispute.** [FAR 33.211 (a) (4) (i)]

By letter dated September 12, 2005, PCL submitted a certified claim "for $19,669,050 as a result of delays and disruptions PCL incurred in performing the contract" ("the claim"). The claim was received by the Contracting Officer on September 13, 2005. By letter dated November 11, 2005, the Contracting Officer notified PCL that he would render a final decision on PCL's claim on or before January 16, 2006.

PCL describes its claim as a "request for additional compensation of $19,669,050 for additional costs PCL and its subcontractors incurred as a result of disruptions to their performance and the costs that result from the extended duration of performance." PCL alleges that "the [COFC] previously determined that the 665 days of extended performance was excusable." Claim at 1.

PCL further describes its claim as follows: "The disruptions and delays generally resulted from design deficiencies associated with differing site conditions and the time taken by the [Government] to redesign the project to reflect the actual site conditions and the time required to complete the extra work." Claim at 1.

PCL also alleges that "nothing in [the decisions of the COFC or the CAFC] expressly, or by implication, preclude this [claim]". Claim at 2.

C. **Pertinent Contract Clauses, Terms, and Conditions.** [FAR 33.211 (a) (4) (ii)]

**Contract Section I.1.7, 52.233-1 Disputes (April 1984) Alternate I (April 1984)**

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613) (the Act).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $50,000 is not a claim under the Act until certified as required by subparagraph (d) (2) below. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(d) (1) A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer.

(2) For Contractor claims exceeding $50,000, the Contractor shall submit with the claim a certification that:

(i) The claim is made in good faith;

(ii) Supporting data are accurate and complete to the best of the Contractor's knowledge and belief; and

(iii) The amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

(3) (i) If the Contractor is an individual, the certification shall be executed by that individual.

(ii) If the Contractor is not an individual, the certification shall be executed by –

(A) A senior company official in charge at the Contractor's plant or location involved; or

(B) An officer or general partner of the Contractor having overall responsibility for the conduct of the Contractor's affairs.

(e) For Contractor claims of $50,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor-certified claims over $50,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

(f) The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

(g) The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Officer receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

(h) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer.

D. **Factual Areas of Agreement and Disagreement.** [FAR 33.211 (a) (4) (iii)]

The Government disagrees with PCL's characterizations of the decisions of the COFC and the CAFC, and otherwise disagrees with the claim in its entirety.

E. **Contracting Officer's Supporting Rationale.** [FAR 33.211 (a) (4) (iii)]

PCL seeks "additional compensation" in the amount of $19,669,050 plus interest "for delays and disruptions PCL incurred in performing the contract." PCL asserts that nothing in the previous decisions of the COFC or the CAFC precludes this claim.

PCL's 1995 total breach claim was a total cost claim which clearly included all costs incurred by PCL in its partial performance of the contract, including for alleged Government "hindrance" of

PCL's construction progress. In its total breach claim, PCL did not segregate "delays and disruptions" from its claim and those costs were therefore before the COFC.

At trial of PCL's total breach claim, PCL elected to pursue a total breach-of-contract theory, and further elected to exclude all other methods, including a traditional delay and/or disruption analysis, to prove entitlement to the money that PCL sought. The "hindrance" alleged by PCL was a fundamental part of PCL's total breach claim, which was based largely upon the number of "design deficiencies" alleged by PCL and the purported "perturbations" to PCL's partial performance that the alleged "design deficiencies" caused.

PCL introduced at trial evidence concerning alleged "hindrance" by the Government, and the COFC specifically addressed the alleged "hindrance", finding that PCL failed to show a cause-and-effect relationship between Government changes to the contract and PCL's increased costs; that PCL failed to prove that the Government caused an impeding effect on PCL's construction operations; that PCL's records did not substantiate any appreciable amount of Government-caused disruption; that PCL failed to demonstrate that its project delay was caused exclusively or even predominantly by the Government; and that no money was due to PCL. See, PCL Construction Services, Inc., v. United States, 47 Fed. Cl. 745, 800-804 (2000).

The Contracting Officer finds that PCL's instant claim for "delays and disruptions" is based upon the same transactional facts that formed the basis of PCL's total breach claim. PCL's depiction of events in the instant claim is contradictory to the law of the case as embodied in the detailed findings of fact already made by the COFC. The Contracting Officer further finds that PCL's claim for "delays and disruptions" has been addressed by the COFC in favor of the Government under Count VII (hindrance) of PCL's Complaint specifically, and the total breach claim generally; that the entire decision of the COFC was affirmed by the CAFC; and that the instant claim is barred by the doctrine of res judicata. This doctrine applies not only to the specific claims that were asserted or emphasized by PCL at the trial of its total breach claim, but also to the claims that could have been made because they arise out of the same transactional facts. See, e.g., Florida Power and Light Co. v. United States, 198 F.3d 1358 (Fed. Cir. 1999). The alleged "hindrance" was a fundamental part of PCL's total breach claim, and PCL's decision to exclude from the total breach claim an explicit claim for delay and/or disruption was its own, and does not serve to remove those elements from the total breach claim litigation or from the effect of res judicata.

**F. Contracting Officer's Final Decision.** [FAR 33.211 (a) (4) (iv)]

In accordance with Section E. above, it is the final decision of the Contracting Officer that PCL's instant claim for "delays and disruptions" is denied in its entirety.

Adjustment in the Contract Time: There is no adjustment in the time required for performance of the contract by reason of this Modification.

Adjustment in the Contract Price: There is no adjustment in the total contract price by reason of this Modification.

Notice of No Change in Funds Reserved: There is no change to the funds previously reserved under the contract.

G. **Notice of Appeal Procedures.** [FAR 33.211 (a) (4) (v)]

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C.603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

I.2.20 52.236-13 ACCIDENT PREVENTION (APR 1984)

(a) In performing this contract, the Contractor shall provide for protecting the lives and health of employees and other persons; preventing damage to property, materials, supplies, and equipment; and avoiding work interruptions. For these purposes, the Contractor shall -

(1) Provide appropriate safety barricades, signs, and signal light;

(2) Comply with the standards issued by the Secretary of Labor at 29 CFR Part 1926 and 29 CFR Part 1910; and

(3) Ensure that any additional measures the Contracting Officer determines to be reasonably necessary for this purpose are taken.

(b) If this contract is with any Department of Defense agency or component, the Contractor shall comply with all pertinent provisions of the U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, dated October 1987.

(c) The Contractor shall maintain an accurate record of exposure data on all accidents incident to work performed under this contract resulting in death, traumatic injury, occupational disease, or damage to property, materials, supplies, or equipment. The Contractor shall report this data in the manner prescribed by the Contracting Officer.

(d) The Contracting Officer shall notify the Contractor of any noncompliance with these requirements and of the corrective action required. This notice, when delivered to the Contractor or the Contractor's representative at the site of the work, shall be deemed sufficient notice of the noncompliance and corrective action required. After receiving the notice, the Contractor shall immediately take corrective action. If the Contractor fails or refuses to take corrective action promptly, the Contracting Officer may issue on order stopping all or part of the work until satisfactory corrective action has been taken. The Contractor shall not base any claim or request for equitable adjustment for additional time or money on any stop order issued under these circumstances.

(e) The Contractor shall be responsible for its subcontractor's compliance with this clause.

I.2.21 52.236-21 SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (APR 1984)

(a) The Contractor shall keep on the worksite a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall

promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at its own risk and expense. The Contracting Officer shall furnish from time to time such detailed drawings and other information as considered necessary, unless otherwise provided.

(b) Wherever in the specifications or upon the drawings the words "directed", "required", "ordered", "designated", "prescribed", or words of like import are used, it shall be understood that the "direction", "requirement", "order", "designation", or "prescription", of the Contracting Officer is intended and similarly the words "approved", "acceptable", "satisfactory", or words of like import shall mean "approved by", or "acceptable to", or "satisfactory to", the Contracting Officer, unless otherwise expressly stated.

(c) Where "as shown", "as indicated", "as detailed", or words of similar import are used, it shall be understood that the reference is made to the drawings accompanying this contract unless stated otherwise. The word "provided" as used herein shall be understood to mean "provide complete in place", that is "furnished and installed".

(d) Shop drawings means drawings, submitted to the Government by the Contractor, subcontractor, any lower tier subcontractor pursuant to a construction contract, showing in detail (1) the proposed fabrication and assembly of structural elements and (2) the installation (i.e., form, fit, and attachment details) of materials or equipment. It includes drawings, diagrams, layouts, schematics, descriptive literature, illustrations, schedules, performance and test data, and similar materials furnished by the Contractor to explain in detail specific portions of the work required by the contract. The Government may duplicate, use, and disclose in any manner and for any purpose shop drawings delivered under this contract.

(e) If this contract requires shop drawings, the Contractor shall coordinate all such drawings, and review them for accuracy, completeness, and compliance with contract requirements and shall indicate its approval thereon as evidence of such coordination and review. Shop drawings submitted to the Contracting Officer without evidence of the Contractor's approval may be returned for resubmission. The Contracting Officer will indicate an approval or disapproval of the shop drawings and if not approved as submitted shall indicate the Government's reasons therefor. Any work done before such approval shall be at the Contractor's risk. Approval by the Contracting Officer shall not relieve the Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this contract, except with respect to variations described and approved in accordance with (f) below.

(f) If shop drawings show variations from the contract requirements, the Contractor shall describe such variations in writing, separate from the drawings, at the time of submission. If the Contracting Officer approves any such variation, the Contracting Officer shall issue an appropriate contract modification, except that, if the variation is minor or does not

involve a change in price or in time of performance, a modification need not be issued.

(g) The Contractor shall submit to the Contracting Officer for approval four copies (unless otherwise indicated) of all shop drawings as called for under the various headings of these specifications. Three sets (unless otherwise indicated) of all shop drawings will be retained by the Contracting Officer and one set will be returned to the Contractor.

(h) This clause shall be included in all subcontracts at any tier.

I.2.22 ADMINISTRATION OF SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION - RECLAMATION (APR 1984)

(a) If individuals other than the Contracting Officer are authorized to approve technical data (e.g., shop drawings, color chips for paint, water control plans, steel building data, or other data of a technical nature), such authorizations shall be set forth in this contract or otherwise provided in writing to the Contractor by the Contracting Officer.

(b) Such authorized representatives of the Contracting Officer do not have the authority to approve technical data that show variations from the contract requirements that involve a change in price or in time of performance, and the Government shall not be liable for any increase in cost or in time of performance resulting from Contractor reliance on such approvals.

(c) Adjustment for Government delay in approving requests for approval of shop drawings or other technical data shall be made only to the extent that (1) Government approval was required under this contract, and (2) the requests for approval were properly and timely submitted and approvable. Any such adjustment shall be subject to the terms of paragraphs (b) and (c) of the Suspension of Work clause of this contract; however, no such delay shall be deemed to be a "suspension order" as the term is used in that clause.

I.2.23 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (APR 1984) - ALTERNATE I (APR 1984)

(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.

(b) After receipt of a Notice of Termination, and except as directed by the Contracting Officer, the Contractor shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due under this clause:

EXHIBIT
R-43

PCL

REQUEST FOR INFORMATION

RFI # S-31

Visitor Center & Parking Structure
A-00108 Contract #1-CC-30-09150

CRx- #11

Subcontractor: PCL Civil Constructors
Subject: Excavation Slope @ Parking
Specification Section:
Description:

Contact: Brett E.
Issue Date: 1-2-92
Plan Sheet: C3.1

See attached PCL Civil RFI #3

REPLY REQUIRED BY: ASAP. A delay in the progress of the project could develop if the reply is not received by the required date. At this time there does/does not appear to be additional cost involved.

DATE: 1-2-92 SIGNATURE: Brett Em[illegible]

Response: See Bureau letter 1/20/92

13. RFI S-31: As discussed at the January 21, 1992, coordination meeting, the rear slope of the parking structure site will be revised to correspond to the natural angle of repose of the existing material.

APPROVED FOR CONSTRUCTION: YES NO By:

Distribution by PCL:

Date:

___ Project Manager
✓ Superintendent
✓ PCL Civil

✓ File Copy
___ CRX # (if applicable)

PCLS 09430
Exhibit 6

00021

PCL

PCL CIVIL CONSTRUCTORS, INC.
Construction Since 1906

CRX #11

REQUEST FOR INFORMATION

DATE: 30 Dec 91 RFI NO. 3

HOOVER DAM VISITORS CENTER SITE WORK
BOULDER CITY, NEVADA

TO: US BUREAU OF RECLAMATION
DON BADER, CIVIL ENGINEER

REFERENCE: Contract Plans Section D - C3.1

QUESTION: Section D sheet C3.1 shows Lower Parking Structure at the back to have 1/4 to 1 slope. Existing site conditions or in-situ material is pit run type material. This material cannot be sloped at a 1/4 to 1. Please give us direction to what should be done in areas without competent rock.

RESPONSE BY USBR:

BY: [signature] PCL CIVIL CONSTRUCTORS, INC.

BY: US BUREAU OF RECLAMATION

1620 West Fountainhead Parkway, Suite 290, Tempe, Arizona 85282 Telephone 602-829-6333 Rapidfax 602-829-8252
License Number 075038-003
(AN EQUAL OPPORTUNITY EMPLOYER)

## SECTION I - CONTRACT CLAUSES

### SUBSECTION I.1 - AUTHORITY

I.1.1 52.202-1 DEFINITIONS (APR 1984) - ALTERNATE I (APR 1984)

(a) "Head of the agency" (also called "agency head") or "Secretary" means the Secretary (or Attorney General, Administrator, Governor, Chairperson, or other chief official, as appropriate) of the agency, including any deputy or assistant chief official of the agency, and, in the Department of Defense, the Under Secretary and any Assistant Secretary of the Departments of the Army, Navy, and Air Force and the Director and Deputy Director of Defense agencies; and the term "authorized representative" means any person, persons, or board (other than the Contracting Officer) authorized to act for the head of the agency or Secretary.

(b) "Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer.

I.1.2 AUTHORITIES AND LIMITATIONS - RECLAMATION (APR 1989)

(a) Authority to modify this contract on behalf of the Government is expressly limited to authorized persons (see 48 CFR 43.102) who are properly designated as Contracting Officers in accordance with 48 CFR 1.6 and 48 CFR 1401.6.

(b) Authority of the Contracting Officer's Technical Representative, properly appointed as such in accordance with 48 CFR 1401.670, is limited to the duties which will be set forth in the designation letter which will be prepared after contract award and is subject to the limitations of 48 CFR 1401.670. A copy of the designation letter will be forwarded to the Contractor for acknowledgment and internal record purposes.

(c) Except as otherwise may be expressly provided in this contract, the Contractor assumes all risks, liabilities, and consequences of performing this contract in accordance with any written or oral order (including but not limited to direction, instruction, interpretation, or determination) of a person not authorized in writing to issue such an order.

I.1.3 COMPLIANCE WITH GOVERNMENT ORDERS - RECLAMATION (APR 1989)

(a) Except as provided in (b) below, the Contractor shall, without unnecessary delay, comply with any written or oral order of the Contracting Officer or his or her authorized representative. For the purpose of this clause, written or oral order includes any direction, instruction, interpretation, or determination, including those related to drawings, other technical data, samples, and literature.

(b) If the Contractor considers that the order was issued without proper authority, it may (and if it also considers such order to be a change pursuant to paragraph (b) of the Changes clause of this contract, it shall) immediately request written confirmation from the Contracting Officer, and any performance pending receipt of such confirmation shall be subject to the provisions of paragraph (c) of the Authorities and Limitations clause of this contract.

I.1.4 ORDER OF PRECEDENCE - CONSTRUCTION - RECLAMATION (MAR 1986)

Any inconsistency in this solicitation shall be resolved by giving precedence in the following order:

(a) The solicitation form, bidding schedule, and contract requirements;

(b) The bid solicitation documents;

(c) The other bid submittal documents;

(d) Contract clauses;

(e) Other documents, exhibits, and attachments, excluding the specifications and drawings;

(f) The specifications; and

(g) The drawings.

I.1.5 52.214-26 AUDIT-SEALED BIDDING (APR 1985)

(a) *Cost or pricing data.* If the Contractor has submitted cost or pricing data in connection with the pricing of any modification to this contract, unless the pricing was based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law or regulation, the Contracting Officer or a representative who is an employee of the Government shall have the right to examine and audit all books, records, documents, and other data of the Contractor (including computations and projections) related to negotiating, pricing, or performing the modification, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data. In the case of pricing any modification, the Comptroller General of the United States or a representative who is an employee of the Government shall have the same rights.

(b) *Availability.* The Contractor shall make available at its office at all reasonable times the materials described in paragraph (a) above, for examination, audit, or reproduction, until 3 years after final payment under this contract, or for any other period specified in Subpart 4.7 of the Federal Acquisition Regulation (FAR). FAR Subpart 4.7, Contractor Records Retention, in effect on the date of this contract, is incorporated by reference in its entirety and made a part of this contract.

United States Department of the Interior

BUREAU OF RECLAMATION
Lower Colorado Dams Project Office
P.O. Box 60400
Boulder City, NV 89006-0400

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:

LCD-C200
ACM-4.00

DEC - 8 1993

PCL Construction Services, Inc.
Hoover Dam Site Office
P.O. Box 60370
Boulder City NV 89006-0370

Subject: Modification No. 054, PCL Designation CRX Nos. 11 and 11.1 - Specifications No. DC-7853/Contract No. 1-CC-30-09150 - Visitors Center and Parking Structure, Hoover Visitor Facilities - Boulder Canyon Project Construction, Nevada (Construction Contract, PCL, 09150)

Gentlemen:

Enclosed are the original and one copy of Modification No. 054 which provides a full and complete equitable adjustment to the contract for the change order directed by Modification No. 038. Modification No. 038 directed you to change the excavation slope at the back of the parking structure from the specified 1/4:1 slope to a 3:1 slope or to rock contact, whichever is encountered first. Excavation in rock remains at the specified 1/4:1 slope.

Please execute and return the original and copy of the modification to this office for signature and further processing. An executed copy of the modification will be returned to you for your files.

A Certificate of Current Cost or Pricing Data is required due to the modification being in excess of $100,000.00. Please submit this certification with the signed modification.

Sincerely,

Jack L. Delp

Jack L. Delp
Construction Engineer

Enclosure (Modification No. 054)

| RECEIVED BY PCL | | | | |
|---|---|---|---|---|
| HOOVER DAM | | | | |
| Dec 8, 1993 | | | | |
| LOG # 2487 | | | | |
| FILE 5200129 2A.1 | | | | |
| CIRC. | C.C. | ACT | INIT | DATE |
| P.M. | X | Orig | | |
| SUPT. | | | | |
| SCHED. | | | | |
| ENG. | | | | |
| Silas | X | X | | 12/8 |
| JRV. | | | | |
| CRX | | | | |
| ACCT. | | | | |
| SECT. | | | | |
| Mod Book | X | X | | 12/8 |
| Ross | X | X | | 12/8 |

PCLC4 0788

Exhibit 8

00025

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE
PAGE 1 OF PAGES 2

2. AMENDMENT/MODIFICATION NO. 054
3. EFFECTIVE DATE See Block 16C
4. REQUISITION/PURCHASE REQ. NO.
5. PROJECT NO. (If applicable)

6. ISSUED BY CODE

U.S. Department of the Interior
Bureau of Reclamation
P.O. Box 61470
Boulder City NV 89006-1470

7. ADMINISTERED BY (If other than Item 6) CODE

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

PCL Construction Services, Inc.
Hoover Dam Site Office
P.O. Box 60370
Boulder City NV 89006-0370

CODE
FACILITY CODE

(√) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO. 1-CC-30-09150/DC-7853

10B. DATED (SEE ITEM 13) September 5, 1991

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
210-8045-1050-130-00-0-0 3CC9150 3237

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (√) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: Paragraph I.4.12, Changes, and Mutual Agreement |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return ~~original and copy~~ ////copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Project Title: Visitor Center and Parking Structure, Hoover Dam, Hoover Visitor Facilities, Boulder Canyon Project, Nevada

The contract is modified to incorporate the following full and complete equitable adjustment for the change order directed by Modification No. 038 (see next page):

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)
15C. DATE SIGNED
16B. UNITED STATES OF AMERICA
BY (Signature of Contracting Officer)
16C. DATE SIGNED

Modification No. 054 to Contract No. 1-CC-30-09150

A. Description of Change: The change is as described in Modification No. 038.

All necessary labor, equipment, and materials required for completion of the work covered by this change shall be furnished by the Contractor.

B. Adjustment in the Contract Price: The adjustment to the total contract price by reason of this change is hereby made as follows:

The total contract price is hereby increased by $299,316.00, from $34,682,998.58 to $34,982,314.58.

C. Adjustment in the Contract Time: No adjustment in the time required for performance of the contract will be made by reason of this change, except that which may be determined as noted in the Release Clause.

D. Release: The Contractor agrees that this supplemental agreement is a complete equitable adjustment for all Contractor proposals or claims whatsoever arising out of, resulting from, and/or directly related to the above occurrences, revisions to the contract, and/or this supplemental agreement and hereby releases the Government from all liability under this contract for further equitable adjustments for said occurrences, revisions, and/or this supplemental agreement, except for time and cost impacts for extended overhead, for impacts on unchanged work, and for any contribution toward the cumulative impact of all changes on the critical path of the project schedule.

E. Notice of Funds Reserved: There is no change to funds previously reserved under this contract. Total funding remains at $22,620,000.00.

It is expressly understood that the Government has no obligation to provide funds in addition to funds reserved in writing.

PCL

5200129
2A.1, 2C and
CRX #11 & CRX #11.1

January 18, 1994

Mr. Jack L. Delp, LCD-C100
Construction Engineer
U.S. Department of the Interior
Bureau of Reclamation
Post Office Box 60400
Boulder City, NV 89006-0400

Reference: Visitor Center and Parking Structure, Hoover Dam
Contract No. 1-CC-30-09150, Specifications No. DC-7853

Dear Mr. Delp:

Enclosed is the original and a copy of Modification No. 54 for further processing and execution by the Government.

This Modification includes our CRX Numbers 11 and 11.1 as proposed, and is based solely on the usual cost elements: such as, labor, material, and normal markups, and does not include any amount for changes in sequence of work, delays, disruptions, rescheduling, extended overhead, acceleration, and/or impact costs. The right is expressly reserved to make claim for any and all of these, and related items of cost, prior to any final settlement of this contract.

Upon signature, please forward a fully-executed copy for our records.

Very truly yours,

PCL CONSTRUCTION SERVICES, INC.

William O. Mizell
Construction Manager

CS/WOM:tmc

Attachments

CC: Mr. Warren Shouldis, Bureau of Reclamation, LC-0820
Mr. Elmer Haight, Bureau of Reclamation, D-3500
Mr. William Noland, PCL Construction Services, Inc.
Mr. Silas Eudy, PCL Construction Services, Inc.
Mr. Doug Knight, PCL Construction Services, Inc.

PCLC4 0785

PCL CONSTRUCTION SERVICES, INC.
P.O. Box 60370, Boulder City, NV 89006-0370, Telephone: (702) 293-5228 Fax: (702) 293-7798
License Number: 002-35-33

Exhibit 9

00028

U. S. Department of Justice

BSSMITH:bss
154-95-666

Tele: (202) 616-0391
Fax: (202) 514-8640

Washington, D.C. 20530

May 27, 1999

Herbert L. Fenster, Esq.
McKenna & Cuneo
Suite 4800
370 Seventeenth Street
Denver, CO 80202

Re: PCL Construction Services, Inc. v. United States
Fed. Cl. No. 95-666C, 96-442C

Dear Mr. Fenster:

In response to your letter of May 21, 1999, enclosing Mr. Schwartzkopf's "schedule and cost analysis" regarding this project, I offer the following. As you know, PCL has now fully litigated its breach of contract liability case which was explicitly premised upon contentions that a detailed schedule and cost analysis was either "not relevant" or "impossible," and that the contractual mechanisms for equitable adjustments are "inadequate." For approximately six years, even prior to PCL's initiation of its breach of contract case, the Government has been proposing that PCL's only legitimate avenue for any potential additional compensation is not via a breach of contract claim, but via a detailed schedule and cost analysis to support an equitable adjustment claim/s -- which is the only type of claim that PCL preserved when the vast majority of the contract changes were resolved in bilateral modifications. PCL ignored our admonitions, however, and the result has been a waste of approximately five years, large expenditures of Government time and costs, and exponentially more costs incurred by the "employee owners" of PCL, all without moving any closer towards a contractual resolution of PCL's delay/impact claims.

Although you now offer Mr. Schwarzkopf's report, and indicate that PCL is "most anxious to reconvene" settlement discussions, it is not in the best interest of the Government to continue to litigate a breach of contract case while at the same time attempting to negotiate the resolution of issues that are only "relevant" to a claim that has never been submitted by PCL. This is especially true considering the history of PCL's so-called efforts to address this dispute[1] and based upon the

[1] Even our previous effort to negotiate a global resolution (continued...)

Exhibit 10

00029

substantive contents of Mr. Schvartzkopf's analysis.[2] Consequently, we will not engage in discussions with PCL unless and until PCL dismisses its breach of contract case with prejudice and submits a certified equitable adjustment claim for delay/impacts, or the Court enters judgment in favor of the Government on all counts of PCL's breach of contract case and PCL submits a certified equitable adjustment claim for delay/impacts. If, on the other hand, the Court finds in favor of PCL upon any aspect of PCL's breach of contract case, the substance of the Court's decision will, by definition, dictate the parameters of any "damages" proceedings and any subsequent settlement discussions.

In conclusion, PCL has already caused two Federal Agencies and a Federal Court to expend substantial resources to deal with PCL's inappropriate breach of contract claim. To the extent that the Department of Justice can prevent further fruitless expenses, we will, and at this point we decline to participate in further efforts to resolve uncertified contentions that (at PCL's own insistence) do not relate to PCL's case.

Very truly yours,

BRIAN S. SMITH
Trial Attorney
Commercial Litigation Branch
Civil Division

---

[1](...continued)
of this dispute was infected with PCL's breach of contract arguments.

[2] PCL's latest attempt, via Mr. Schwartzkopf, to blame Reclamation for all of PCL's project delay is facially ridiculous. It appears that PCL's only goal, regardless of the facts, legal limitations, and PCL's own previous positions, is to somehow obtain a recovery of $30 million or more. Without even addressing the errors in Mr. Schwartzkopf's report (particularly his failure to understand Mr. Caruso's work), his conclusions are not consistent with the facts of the project, and are in sharp contradiction to contentions that PCL has spent years and many hundreds of thousands of dollars to develop — that a detailed analysis is not possible (Kellogg), that Reclamation is not responsible for all project delay (Petersen), that it was impossible for PCL to prepare time impact evaluations for this project (Schwartzkopf). Further, if Mr. Schwartzkopf's cost conclusions were valid at all, they would confirm that PCL's REA, which sought virtually the same amount — but only for one-half of the project, was severely defective.

**PCL Construction Services v. U.S. No.: 95-666C July 2, 1999**

**Heritage Reporting Corporation**

**Page 12778 to Page 13050**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Exhibit 11

Page 12978

isn't called an equitable adjustment claim" is not accurate.

THE COURT: What are you saying? What is the impact? Assuming for a moment -- and I'm going to ask you a question at the end.

MR. SMITH: Sure.

THE COURT: But assuming for a moment that Mr. Fenster is correct in his argument that the breach of contract claim is in his complaint, but so is a change order or defective specification claim, which I know you take issue with. But assuming for a moment that he is correct, what's the impact of this release language?

MR. SMITH: Well, okay. The impact of this release language is that they are releasing everything but an equitable adjustment for the time and cost impacts or extended overhead for impacts on unchanged work and for any contribution towards cumulative impact of all changes on the critical path of project schedule.

THE COURT: So the changes claims under that theory, assuming he is correct, which we're not deciding right now --

MR. SMITH: Right.

THE COURT: The impact of the changes

Page 12979

would survive?

MR. SMITH: They did not release the right to present an equitable adjustment delay claim.

THE COURT: And that would be the only thing that would survive?

MR. SMITH: Yes. Exactly. That is what we're saying, is that is the only thing that survived this release. They reserved for themselves the right to do it.

And yeah, you're right, our position certainly is this case has not and has never been, either in its pleading form or in its evidence form, that kind of claim. And their experts said it 100 times. "No, this is not a critical path delay claim. This is not an equitable adjustment claim. This is a breach claim." Blah, blah, blah.

So they reserved the right to take the equitable adjustment claim for delays caused by the changes to the vehicle ramp. But they didn't plead it in their contract, and they certainly didn't prove it in their trial. So we can't be held accountable.

I guess PCL said in their reply brief, "No, we didn't." And I'm saying yes, they did, and I just read it to you. So that is the release language.

There were minor modifications.

Page 12980

THE COURT: That's pretty standard release language, right?

MR. SMITH: Yes. And it is also very standard for the relationship between these two parties. They used that language in virtually all of their modifications.

I think in our brief, we pointed out there is actually one claim or issue that they mentioned at trial where they actually -- there wasn't any reservation of rights at all. It was a blanket release.

But, in general, that release language governs, and we believe severely limits what PCL can recover for as a result of the changes that were the subject of those modifications, and that precludes at least 95 percent of the evidence that was presented to you in support of the, quote, breach of contract claim.

All right. Now, let's talk about -- let's talk about CPM. Mr. Fenster had some criticism for Mr. Caruso's analysis in his closing, as he did in the trial, and as his experts did in the trial.

Particularly Mr. Schwartzkopf.

And Mr. Fenster made a list of six things that he thinks should be considered when conducting a

Page 12981

delay analysis. And he argued to you that Mr. Caruso's delay analysis only considered one of them.

Again, without going over Mr. Caruso's testimony in great detail, his report is voluminous and speaks for itself. The fact of the matter is, and the evidence showed, that when he did his analysis of this project -- and by the way, I have some of the work product here laid out around the courtroom. It is Defendant's Exhibit 2257 and 2254.

And let me digress here for a moment just to talk about that for a minute. You may remember Mr. Caruso's as-built schedule. And what it is is literally every single day of this entire project.

Mr. Caruso's firm went through the project records and reported and analyzed what was going on on the project, and produced this analysis that shows what was going on on the project.

So when you take all of this together, and it takes three boards to show each aspect of the project. For instance, the parking structure. And then another three boards for the visitors center.

What you arrive at when you're done is an exact depiction of what happened on this job.

And this isn't something that Mr. Caruso needed to formulate. It was something that is fact.

00032

Page 12994

of?

MR. SMITH: Fully. Absolutely. So that's it. Those are the counts that are before you. That's what you should do on this case. The government is not liable on any of these counts. PCL has not presented claims that would show otherwise. And that is how you dispose of this case. The end.

You wanted to talk about alternatives, which I will if you want.

THE COURT: I do.

MR. SMITH: This is what you should do. That is the right thing to do.

THE COURT: That is if I agree with you that the other issues are not raised in the complaint.

MR. SMITH: Yeah. Okay. I'll talk about that in a minute. So PCL wants you to find total breach. That is something you could do, and then we would go off to a damages trial and argue about what PCL has to prove now that it has proven the government liable for total breach.

It goes without saying that I don't think you should do that. PCL uses the word partial breach in its reply brief, and I can't tell whether they are suggesting that partial breach occurred or what it is. Frankly, I don't think there are legal

Page 12995

grounds for such an animal. I've certainly never heard of a partial cardinal change or a partial misrepresentation or anything like that. So I don't think that's an alternative either. Certainly not a viable one.

No. 4 here, no breach, is what you should do. Then PCL will be free to go off and make an equitable adjustment claim if it wants to. The contracting officer will get an opportunity to pass on it, as he has never been provided.

And if the parties do not resolve them at that level, it will proceed just like a normal case. And maybe or maybe not you and I will see each other again litigating an equitable adjustment claim for delay. But that is the effect of what happens if you find no breach.

THE COURT: And you're taking the position that despite all of the back and forth with the contracting officers in this case, including the good, the bad, and the ugly, that this equitable adjustment claim was never presented to the contracting officer or was simply never properly offered in this particular case, because they're different?

MR. SMITH: No equitable adjustment claim was ever presented to the contracting officer as a

Page 12996

certified claim, which is the gate through which they must pass to get to this Court. There is a certified claim, but it's a breach of contract claim.

THE COURT: So the only certified claim you're saying that was presented to the contracting officer was for breach of contract?

MR. SMITH: Yes. And we cite that in our brief. And the exhibit itself, that is their certified claim, certainly the cover letter is very easy for you to read, for you to pass on that issue too. There was no middle ground in that claim. They did not present an alternative basis as an equitable adjustment. And you heard PCL's witnesses tell you we were pursuing breach here.

THE COURT: What I'm trying to separate out --

MR. SMITH: Yes.

THE COURT: -- is the time after and following the presentation of the complaint in the case versus the time of the contracting officers. And that's what I meant when I said it's different. And I think the witnesses here -- maybe I'm wrong, but most of the witnesses here dealt primarily with the complaint in the Court, because they were expert witnesses hired primarily for the Court

Page 12997

case.

So the question I asked you earlier is the same one I'll ask again. In front of the contracting officer, you're relying essentially, then, on the letter?

MR. SMITH: Yes.

THE COURT: The cover letter?

MR. SMITH: Yeah. I mean, I'm not shying away from the contents of the entire claim itself. The only thing ever certified to the contracting officer was -- I don't think the word total is in there -- is the breach of contract.

THE COURT: Because I think there's a middle leap there, if you take some of the expert witness testimony, and transpose it backwards.

MR. SMITH: With all due respect, I'm not transposing it backward. If you care to review the transcript --

THE COURT: I do care to review the transcript. I have reviewed the transcript, and I will review the transcript.

MR. SMITH: With Mr. Kellogg, I distinctly recall -- with Mr. Kellogg, I distinctly recall a rather lengthy exchange between himself and myself about the thinking, who was deciding what. And it was

00033

Page 12998

all decided about what was going into the certified claim, not what was going into the complaint. I don't remember asking about that at all, as a matter of fact.

THE COURT: I guess what I was getting at more was some of the negotiations, or the multiple negotiations which ultimately failed, because he left, the original contracting officer left.

MR. SMITH: It sounds like you're referring to the REA.

THE COURT: Essentially, yes.

MR. SMITH: The REA is a totally different animal that preceded the certified claim in time by a number of years.

THE COURT: Right.

MR. SMITH: It was not certified, which is certainly the key. That's the most important aspect of it. Just to address what you're saying, there was actually no negotiation with Mr. Shouldis on that. It was presented literally on the day that he was retiring.

THE COURT: There were negotiations prior to that, not necessarily after the REA. There were discussions to take away the word "negotiations," if that makes you happier.

MR. SMITH: Well, there were discussions

Page 12999

of all of these issues when they arose and when the direct costs were being negotiated and when the direct costs were discussed.

THE COURT: I'm just trying to understand your position.

MR. SMITH: Our position is the only certified claim -- which is the gate we must walk through to get to this Court -- that was presented to the CO is a breach of contract claim. And no matter how you try to read it, there was no equitable adjustment claim there. That leaves, though, that one item on my list there. I'm used to defending equitable adjustment claims. You're used to adjudicating them. Frankly, legally I don't think it's possible to take the evidence in this case and arrive at a liability determination for equitable adjustment. Not only was it not pled that way, it was not presented that way either. PCL didn't try to show you we're liable for an equitable adjustment for the ped ramp or for the triangular bridge, and certainly not for a lot of the other things. Let's not forget that over half of the 665 days of delays occurred after all of these issues that

Page 13000

we've been talking about at this trial were resolved. The second half of the project, after they were out of the ground. They're inside, they're building, they're doing things, and they're getting delayed a lot. And nobody's presented any evidence about whose fault that was, or anything whereby you could determine any type of liability for an equitable adjustment.

THE COURT: There's been some talk in this case at various points that there is grounds for an equitable adjustment. I think even you said at various points along the way that had this been pled differently -- you were very careful to couch your language appropriately on behalf of your client. But there's certainly been language that there's some grounds for equitable adjustments. There's a vast difference in what you would consider appropriate and what the plaintiff would consider appropriate, even taking out the total breach theory. But what's the correct result here? Do we send this back to the contracting officer while maintaining jurisdiction or not maintaining jurisdiction? I can do it one of several ways. Let's assume that's where I go for a moment, again, without

Page 13001

telling you where I'm going. But talking hypothetically, let's assume that I think the right result is, in fact, to go the equitable adjustment route. We can dismiss the case at this point without prejudice, or with prejudice, on the issues that we've decided and send it back. I can obviously, and would, I guarantee you, make sure that it came back to me, because there is no other judge that ought to be forced to start from scratch here.

MR. SMITH: Right.

THE COURT: That makes no sense whatsoever. And we do that on complex cases that have to be sent back for certification on a number of occasions. Or do we somehow maintain jurisdiction, or is there a way to maintain jurisdiction? And I know what the Justice Department's position is, I think. But I want to hear it from you.

MR. SMITH: Right. First of all, yes, that is.

THE COURT: Yes to which part?

MR. SMITH: That is what you should do. You should find that there was no breach of contract here, that all of those counts that I just went over were not proven. Maybe there's an equitable adjustment

00034

(c) If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, the Contracting Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

(d) If a stop-work order is not canceled and the work covered by the order is terminated for default, the Contracting Officer shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

(e) The Government's rights to terminate this contract at any time are not affected by action taken under this clause.

I.4.10 52.236-2 DIFFERING SITE CONDITIONS (APR 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required: provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

I.4.11 ADMINISTRATION OF DIFFERING SITE CONDITIONS - RECLAMATION (APR 1984)

If the time prescribed for giving written notice is extended by the Contracting Officer, the Government shall not be liable for any increased cost or effect on the required delivery schedule prior to the time when the Contracting Officer received actual notice of the existence of the differing site condition.

I.4.12 52.243-4 CHANGES (AUG 1987)

(a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes -

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government-furnished facilities, equipment, materials, services, or site; or

(4) Directing acceleration in the performance of the work.

(b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretations, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.

(c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

(f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

* Subsections 27(a), (b), and (d) are effective on December 1, 1990. Subsection 27(f) is effective on June 1, 1991.

THIS CERTIFICATION CONCERNS A MATTER WITHIN THE JURISDICTION OF AN AGENCY OF THE UNITED STATES AND THE MAKING OF A FALSE, FICTITIOUS, OR FRAUDULENT CERTIFICATION MAY RENDER THE MAKER SUBJECT TO PROSECUTION UNDER TITLE 18, UNITED STATES CODE, SECTION 1001.

(End of certification)

(d) In making the certification in paragraph (2) of the certificate, the officer or employee of the competing Contractor responsible for the offer or bid, may rely upon a one-time certification from each individual required to submit a certification to the competing Contractor, supplemented by periodic training. These certifications shall be obtained at the earliest possible date after an individual required to certify begins employment or association with the Contractor. If a Contractor decides to rely on a certification executed prior to the suspension of section 27 (i.e., prior to December 1, 1989), the Contractor shall ensure that an individual who has so certified is notified that section 27 has been reinstated. These certifications shall be maintained by the Contractor for a period of 6 years from the date a certifying employee's employment with the company ends or, for an agency, representative, or consultant, 6 years from the date such individual ceases to act on behalf of the Contractor.

(e) The certification required by paragraph (c) of this clause is a material representation of fact upon which reliance will be placed in executing this modification.

I.4.2 52.212-11 VARIATION IN ESTIMATED QUANTITY (APR 1984)

If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity. If the quantity variation is such as to cause an increase in the time necessary for completion, the Contractor may request, in writing, an extension of time, to be received by the Contracting Officer within 10 days from the beginning of the delay, or within such further period as may be granted by the Contracting Officer before the date of final settlement of the contract. Upon the receipt of a written request for an extension, the Contracting Officer shall ascertain the facts and make an adjustment for extending the completion date as, in the judgment of the Contracting Officer, is justified.

I.4.3 52.212-12 SUSPENSION OF WORK (APR 1984)

(a) The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract

for the period of time that the Contracting Officer determines appropriate for the convenience of the Government.

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

(c) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order), and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment under the contract.

I.4.4 52.214-27 PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA - MODIFICATIONS - SEALED BIDDING (JAN 1991)

(a) This clause shall become operative only for any modification to this contract involving aggregate increases and/or decreases in costs, plus applicable profits, of more than $100,000 except that this clause does not apply to any modification for which the price is -

(1) Based on adequate price competition;

(2) Based on established catalog or market prices of commercial items sold in substantial quantities to the general public; or

(3) Set by law or regulation.

(b) If any price, including profit, negotiated in connection with any modification under this clause was increased by any significant amount because (1) the Contractor or a subcontractor furnished cost or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data, (2) a subcontractor or a prospective subcontractor furnished the Contractor cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data, or (3) any of these parties furnished data of any description that were not accurate, the